IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:17-CV-282-FL

RICHARD SYLVESTER ALLEGOOD,          )
                                     )
                    Plaintiff,       )
                                     )
         v.                          )
                                     )              ORDER
ROGER D. GRAHAM, JR.,                )
                                     )
                    Defendant.       )

This matter is before the court on defendant's motion for summary judgment as to all claims (DE 66), and plaintiff's motion for summary judgment in part as to his criminal conversation claim (DE 70). These motions have been briefed fully. In this posture, the issues raised are ripe for ruling. For the following reasons, the motions are denied.

## STATEMENT OF THE CASE

Plaintiff commenced this action in Wilson County Superior Court asserting claims of alienation of affection and criminal conversation against defendant, arising out of the conclusion of plaintiff's marriage with plaintiff's former wife, Patricia Mead Allegood ("Ms. Allegood"). Plaintiff seeks compensatory and punitive damages. Defendant removed the suit to this court on June 9, 2017, on the basis of diversity jurisdiction. After a period of discovery, and extensions of time thereof, the parties filed the instant motions for summary judgment on September 17, 2018.

Defendant seeks summary judgment on the basis that the North Carolina laws of alienation of affection and criminal conversation are unconstitutional as applied to him. In support of his motion, defendant relies upon a memorandum, statement of facts, and appendix containing: 1)

declarations of Ms. Allegood and Eliza Barnes and Olivia Barnes, who are Ms. Allegood's children from a prior marriage and plaintiff's step-children; 2) declarations of a colleague and friend of Ms. Allegood, as well as boyfriend of Olivia Barnes; 3) excerpts of depositions of plaintiff, defendant, and Ms. Allegood; 4) excerpts of plaintiff's and defendant's discovery responses; 5) excerpts of text messages; 6) financial and gambling records; 7) email correspondence; and 8) expert report of Dr. Jean G. Spaulding.

That same date, plaintiff filed the instant summary judgment motion asserting that there is no genuine issue of fact as to liability on his criminal conversation claim. In support thereof, plaintiff relies upon a memorandum, statement of facts, and appendix containing: 1) excerpts of depositions of plaintiff, defendant, and Ms. Allegood, as well as notices regarding the same; 2) excerpts of defendant's discovery responses; and 3) excerpts of text messages.

On October 9, 2018, plaintiff responded in opposition to defendant's motion, relying upon an opposing statement of material facts and appendix thereto containing: 1) additional excerpts of depositions of plaintiff, defendant, and Ms. Allegood; 2) declarations by plaintiff, as well as plaintiff's friend, brother, sister, and sister-in-law; 3) excerpts of text messages and family correspondence and photos; 4) excerpts of discovery requests and responses in this case and in divorce proceeding between plaintiff and Ms. Allegood in Wilson County District Court, Case No. 17 CVD 723. That same date, defendant responded in opposition to plaintiff's motion, relying upon a supplemental appendix to his statement of material facts containing a supplemental declaration of Ms. Allegood.

On October 23, 2018, the parties filed replies in support of their respective motions. In support of his reply, plaintiff relies upon a supplemental appendix containing additional excerpts of text messages between plaintiff, Ms. Allegood, and Eliza Barnes.

## STATEMENT OF FACTS

The undisputed facts and other facts viewed in the light most favorable to plaintiff may be summarized as follows.[1]

A.    Plaintiff's Marriage with Ms. Allegood

Plaintiff and Ms. Allegood were married on December 3, 2004; it was her second marriage. (Def's Stmt. (DE 68) ¶ 1). Ms. Allegood was living in Raleigh at the time with her two daughters, Olivia Barnes and Eliza Barnes. (Id.). She and her daughters moved into plaintiff's home in Wilson about a year later. (Id.). Olivia Barnes completed college and moved to Charlotte in 2011. (Id.). Eliza Barnes completed college and moved to Charlotte in 2014, and then to St. Simons, Georgia in 2016. (Id.).

During the first seven years of their marriage, Ms. Allegood did not work outside the home. (Pl's Stmt. (DE 78) ¶ 96). Plaintiff worked for a business, Acirris, and supported the family financially during that time. (Id.; Ms. Allegood Dep. (DE 80-7) p. 43-44, 66).[2] Plaintiff formed a company, Strategic Affinity Group, Inc., in June 2013, but that company did not earn any reportable income. (Def's Stmt. (DE 68) ¶ 5; Pl's Stmt. (DE 78) ¶ 96). During the last seven years of the

---

[1] Additional facts viewed in the light most favorable to defendant will be addressed in conjunction with analysis of plaintiff's motion for partial summary judgment on the criminal conversation claim.

[2] Citations to depositions in the record specify page numbering as shown on the face of the deposition transcript, not the page number specified by the court's electronic case filing (ECF) system, where excerpts of depositions in some instances are filed at different locations in the record.

marriage, plaintiff did not have any gainful employment, with one exception when plaintiff worked as a mortgage lender for Wells Fargo from June 2014 to August 2014.  (Id.).

Ms. Allegood began working as a pharmaceutical and medical sales representative in January 2012.  (Def's Stmt. (DE 68) ¶ 2).  In November 2015, she joined Mylan as a hospital field sales representative, where she worked until approximately March 2017.  (Id.).  According to plaintiff: "[Ms. Allegood] was supporting me and  - - and my work in trying to generate something with my new company since I had done so much for her and the girls over the years.  She had - - she said she had faith in me, she believed in me, to take the time I needed."  (Pl's Dep. p. 43 (DE 80-8)).

During their marriage, Ms. Allegood accompanied plaintiff on numerous trips to casinos, and her "family including her daughters, mother, four sisters, brothers-in-law, sister's children, and daughters' boyfriends have enjoyed accommodations, food, alcoholic beverages, spa treatments, air fare, transportation, jewelry, and shows valued at tens of thousands of dollars . . . on numerous trips and visits to casinos in Michigan, New Jersey, Nevada, Mississippi, and the Bahamas."  (Pl's Decl. (DE 80-5) ¶ 5).

During 2016, plaintiff and Ms. Allegood went on a number of trips together and with their family members.  (Pl's Decl. (DE 80-5) ¶¶ 7-8).  These included a family trip to Bald Head Island, trips to casinos in Atlantic City, and trips to visit Olivia Barnes and Eliza Barnes.  (Id.). They celebrated their twelfth wedding anniversary together at the Borgata Casino, in Atlantic City. (Id. ¶ 8).  In 2016, they exchanged hundreds of phone calls and numerous text messages.  (Id. ¶ 10). They were in family pictures together and appeared in a 2017 New Year's card.  (Id. ¶ 9).

Ms. Allegood attended a business convention in Anaheim, California, between January 29, 2017, and February 2, 2017.  (Pl's Stmt. (DE 78) ¶ 71).  Originally, Ms. Allegood planned on having

plaintiff come with her for the trip, but he could not attend due to a rescheduled surgery. (Id. ¶ 75). During the trip to Anaheim, Ms. Allegood communicated with plaintiff and messaged him that she loved him. (Id. ¶ 72). Plaintiff picked Ms. Allegood up from the airport, and Ms. Allegood stayed at the home in Wilson until February 8, 2017, when she spent the night away. (Pl's Stmt. (DE 73) ¶ 16). She returned home February 9, 2017, and then visited her daughter in Charlotte from February 10, 2017, to February 13, 2017. (Id. ¶ 17). She returned home on February 13, 2017, and stayed until February 16, 2017. (Id. ¶¶ 18-20).

On February 16, 2017, Ms. Allegood traveled to Wilmington, North Carolina, and she told plaintiff that she needed to be there for work purposes and through the night of February 18, 2017, because she was sick. (Pl's Stmt. (DE 73) ¶ 28). "Plaintiff was supposed to accompany [Ms. Allegood] and her daughters, his stepdaughters, on a planned vacation to Bald Head Island, North Carolina that Plaintiff had arranged" for the upcoming weekend. (Id. ¶ 31). "However, Plaintiff agreed not to go when [Ms. Allegood] and his stepdaughters indicated they wanted a 'girls weekend' to help support one of them regarding a relationship trouble." (Id.). Plaintiff instead went on a trip on his own to Borgata Casino, and Ms. Allegood texted him: "go win us a car." (Pl's Stmt. (DE 78) ¶ 7).

Upon returning from the Bald Head Island trip, Ms. Allegood spent the night in the home in Wilson with plaintiff, overnight on February 21, 2017. (Pl's Stmt. (DE 73) ¶ 33). Ms. Allegood left for work-related travel in Virginia on February 22, 2017. (Id. ¶ 35). Plaintiff understood that Ms. Allegood would be returning home the following day, on February 23, 2017. (Id.). However, on February 23, 2017, during the day, Ms. Allegood called plaintiff to say she had to go to Richmond, Virgina, to stay overnight. (Pl's Stmt. (DE 78) ¶ 59). In the evening of February 23,

2017, Ms. Allegood called plaintiff and told plaintiff "that she wanted to separate and needed some space for a little while." (Id.). "Plaintiff was completely blindsided and devestated." (Id.). Ms. Allegood returned to Wilson on February 24, 2017, to pack up belongings and take the dog on a walk with plaintiff. (Id. ¶ 62). She texted plaintiff that evening: "I left love you." (Id.) (syntax as in original). On March 3, 2017, Ms. Allegood texted plaintiff stating that she still needed space and that it had "barely been a week" since their separation. (Id. ¶ 63). Ms. Allegood "has now divorced Plaintiff." (Id. ¶ 105).

B. Ms. Allegood's Relationship with Defendant

During the time period of the preceding events, Ms. Allegood was developing a relationship with defendant, as follows. At the time Ms. Allegood was working for Mylan, defendant was the president of the "specialty division" in which Ms. Allegood was working as a sales representative. (Def's Stmt. (DE 68) ¶ 29). Defendant and Ms. Allegood first met in February 2016 during her training at Mylan's corporate office in Pennsylvania, where defendant sat next to Ms. Allegood at her "graduation dinner." (Id. ¶ 30). They also saw each other and spoke together at a work function in Orlando, Florida, in November 2016. (Pl's Stmt. (DE 78) ¶ 78; Ms. Allegood Dep. (DE 80-7) at 106-107).

During the Mylan convention from January 29, 2017, through February 2, 2017, in Anaheim, Ms. Allegood "spent private but non-sexual time alone with Defendant in his hotel room on one night, and the following night they spent private but non-sexual alone time together in [Ms. Allegood's] hotel room." (Pl's Stmt. (DE 78) ¶ 71). While plaintiff was in Wilmington, North Carolina, area from February 16, 2017, to February 18, 2017, she spent part of that time with defendant. (Id. ¶ 67). Defendant traveled to North Carolina, from Pennsylvania, for the purpose of

visiting with Ms. Allegood, arriving on February 17, 2017. (Pl's Stmt. (DE 73) ¶ 23). They spent the night of February 17, 2017, together in a hotel. (Id. ¶ 24). They had sexual intercourse twice while together at a different hotel in the evening of February 18, 2017. (Id. ¶ 26). They parted on February 19, 2017, and defendant returned to Pennsylvania on February 20, 2017. (Def's Dep. (DE 80-6) pp. 231-232).

Ms. Allegood and defendant next stayed together at a hotel resort in Virginia on February 24, 2017. (Id. ¶ 38). Thereafter, they began living together, and defendant has continued a sexual and romantic relationship with Ms. Allegood to present. (Id. ¶ 45).

Additional facts pertinent to the instant motions will be addressed in the analysis herein.

## DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted).

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the

suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

B.    Analysis

1.    Defendant's Motion

As noted above, defendant seeks summary judgment on the basis that the North Carolina laws of alienation of affection and criminal conversation are unconstitutional as applied to him. To address the issues raised by this motion, the court begins first with an overview of the torts of

alienation of affection and criminal conversation, followed by a review of challenges to these laws under the constitution and common law. Then, the court turns to the basis for defendant's present constitutional challenge, followed by an application of principles for adjudicating defendant's constitutionality defense at this juncture.

a. Overview of Torts

To establish a claim for alienation of affection under North Carolina law, a plaintiff must demonstrate: "(1) That he and his wife were happily married, and that a genuine love and affection existed between them; (2) that the love and affection so existing was alienated and destroyed; [and] (3) that the wrongful and malicious acts of the defendants produced and brought about the loss and alienation of such love and affection." Litchfield v. Cox, 266 N.C. 622, 623 (1966). "[I]n cases where there has been no adultery, seduction or improper relationship, . . . malice is an essential element of the action for alienation of affections." Bishop v. Glazener, 245 N.C. 592, 596 (1957); see Rodriguez v. Lemus, 810 S.E.2d 1, 3 (N.C. Ct. App. 2018) ("Malice is conclusively presumed by a showing that the defendant engaged in sexual intercourse with the plaintiff's spouse.").

To establish a claim for criminal conversation, a plaintiff must show "the defilement of the wife by sexual relation." Cottle v. Johnson, 179 N.C. 426, 102 S.E. 769, 770 (1920); see Nunn v. Allen, 154 N.C. App. 523, 535 (2002) ("The elements of the tort of criminal conversation are . . . [1] marriage between the spouses and [2] sexual intercourse between defendant and the plaintiff's spouse during the coverture.").

In addition, the North Carolina General Statutes, since 2009, have limited the scope of the actions for alienation of affection and criminal conversation, by providing that "[n]o act of the defendant shall give rise to a cause of action for alienation of affection or criminal conversation that

occurs after the plaintiff and the plaintiff's spouse physically separate with the intent of either the plaintiff or plaintiff's spouse that the physical separation remain permanent." N.C. Gen. Stat. § 52-13(a).

      b.    Challenges to the Torts

Alienation of affection and criminal conversation remain viable torts in North Carolina law despite attempts at challenges in North Carolina and federal courts.

In 1984, the North Carolina Court of Appeals attempted to "hold that the causes of actions of alienation of affections and criminal conversation are hereby abolished in this jurisdiction," observing that "[o]ver the last fifty years the two tort actions have come under considerable attack from the public, commentators, and the courts and nearly half the state legislatures have abolished them." Cannon v. Miller, 71 N.C. App. 460, 497 (1984). The North Carolina Supreme Court, however, summarily vacated that decision, noting the North Carolina Court of Appeals "acted under a misapprehension of its authority to overrule decisions of the Supreme Court of North Carolina and its responsibility to follow those decisions, until otherwise ordered by the Supreme Court." Cannon v. Miller, 313 N.C. 324, 324 (1985).

In 2017, the North Carolina Court of Appeals rejected an argument that the torts are "facially unconstitutional because they violate individuals' First and Fourteenth Amendment rights to engage in intimate sexual activity, speech, and expression with other consenting adults." Malecek v. Williams, 804 S.E.2d 592, 594 (N.C. Ct. App. 2017). The court rejected an argument that the torts violated a Fourteenth Amendment right to engage in intimate sexual activities, applying Lawrence v. Texas, 539 U.S. 558 (2003). The court also rejected an argument that the torts violated a First Amendment right to freedom of expression and association, applying United States v. O'Brien, 391

U.S. 367 (1968). The court stated in dicta, however, "there are situations in which these torts likely are unconstitutional as applied." Malacek, 804 S.E.2d at 594.

Federal district courts in North Carolina also recently have rejected arguments that the torts are facially unconstitutional by infringing Fourteenth Amendment rights to engage in intimate sexual activities and First Amendment rights to freedom of speech and association. See, e.g., Ammarell v. France, No. 316CV00708RJCDSC, 2018 WL 2843441, at *3 -*9 (W.D.N.C. June 11, 2018) (applying cases including Lawrence, 539 U.S. at 578 and O'Brien, 391 U.S. at 376); VonFeldt v. Grapsy, No. 1:16CV1179, 2017 WL 1187841, at *1 (M.D.N.C. Mar. 30, 2017) (applying cases, including Lawrence, 539 U.S. at 578). The Middle District of North Carolina also rejected an "as-applied" challenge in VonFeldt. See 2017 WL 590337 * 7.

c.      Basis for Defendant's Challenge

Defendant bases his present constitutional challenge upon the recognition in dicta by the North Carolina Court of Appeals in Malacek that, although courts have uniformly rejected facial challenges to alienation of affection and criminal conversation, "[t]here may be situations where an as-applied challenge to these laws could succeed." (Def's Mem. (DE 67) at 2 (quoting Malacek, 804 S.E.2d at 594)). Defendant's arguments track the substantive grounds rejected in prior facial challenges. He contends that imposing liability on him for torts of alienation of affection and criminal conversation violates his Fourteenth Amendment rights to engage in intimate sexual activities, under Lawrence, 539 U.S. at 567. He also contends that imposing liability on him for these torts violates his First Amendment right of freedom of association, under Roberts, 468 U.S. at 617-623.

### d. Application

Defendant's assertion of an as-applied constitutionality defense at this juncture fails for two reasons, set forth in turn below.

#### i. Other Grounds for Decision

First and foremost, there exist in this case other grounds for avoiding liability that defendant may assert in his defense at trial, and those grounds must be addressed before the court embarks on an as-applied constitutional analysis. "[A]n as-applied challenge is based on a developed factual record and the application of a statute to a specific person." Educ. Media Co. at Virginia Tech v. Insley, 731 F.3d 291, 298 n. 5 (4th Cir. 2013) (quotations omitted). By contrast, "[a] facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." Bucklew v. Precythe, 139 S. Ct. 1112, 1127 (2019). "[T]he substantive rule of law is the same for both facial and as-applied challenges," and "the facial/as-applied distinction affects the extent to which the invalidity of a statute need be demonstrated, not the substantive rule of law to be used." Id. at 1128 (quotations omitted).

Courts have a "duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case." Harmon v. Brucker, 355 U.S. 579, 581 (1958). "The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." Bell Atl. Maryland, Inc. v. Prince George's Cty., Maryland, 212 F.3d 863, 866 (4th Cir. 2000) (emphasis added; quotations omitted). "Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." Id. (quotations omitted).

In this manner, the United States Court of Appeals for the Fourth Circuit held in <u>Bell</u> that "by deciding the constitutional question . . . in advance of considering the state law questions upon which the case <u>might have been disposed of</u>, the district court committed reversible error." <u>Id.</u> Likewise, in <u>United States v. Hill</u>, 700 F. App'x 235, 237 (4th Cir. 2017), the court held that "because the facts proffered here may or may not be developed at trial, it is premature to determine the constitutional issues."

In this case, application of this rule is particularly important, where the as-applied challenge is to be "based on a developed factual record." <u>Richmond Med. Ctr. for Women v. Herring</u>, 570 F.3d 165, 172 (4th Cir. 2009) (en banc). There are significant disputed issues of fact central both to the elements of the torts at issue and to the constitutional analysis, as detailed further below. Defendant seeks to have the court decide an as-applied constitutional question on the basis of a summary judgment standard, in which facts must be viewed in the light most favorable to plaintiff, drawing all inferences in favor of the plaintiff. <u>See</u> <u>Anderson</u>, 477 U.S. at 255. In this manner, defendant seeks a ruling before full development of the record at trial.

Moreover, both plaintiff and defendant concede that there are genuine issues of material fact as to proof of the essential elements of alienation of affection in this case. (<u>See, e.g.,</u> Pl's Opp. (DE 77) at 4; Def's Reply (DE 85) pp. 3 n. 2 & 5 n. 6). Further, as set forth further below, plaintiff has failed to demonstrate an absence of genuine issue of fact on the criminal conversation claim. Defendant will have ample opportunity at trial to demonstrate to the jury that plaintiff has not brought forth facts establishing all the elements of his claims, thus necessitating a jury verdict on the merits in favor of defendant. Because this result "may be" achieved at trial, and the case "might" be disposed at trial on the merits, this court is precluded from deciding the constitutional issue raised

by defendant's motion. <u>Bell</u>, 212 F.3d at 866; <u>see</u> <u>Harmon</u>, 355 U.S. at 581; <u>Hill</u>, 700 F. App'x at 237.

Defendant suggests that the rule against deciding constitutional questions does not arise where a summary judgment motion raises only constitutional arguments, citing <u>Blitz v. Napolitano</u>, 700 F.3d 733, 739 (4th Cir. 2012). As an initial matter <u>Blitz</u> does not support defendant's suggestion. Rather, it confirms the general rule that "[i]t is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." <u>Id.</u> (quotations omitted). In any event, defendant's suggestion does not take into account the full procedural circumstances here. While defendant only raises constitutional arguments in support of his motion for summary judgment, he also raises non-constitutional arguments in opposing plaintiff's motion for summary judgment, and defendant expressly does not concede liability on either claim. (<u>See</u> Def's Reply (DE 85) at 5 n. 5; Def's Opp. to S.J. (DE 79) at 1-2). Plaintiff also may fail to prove damages. Thus, a non-constitutional resolution of this case is still possible through a jury trial on the merits.

In sum, the court is precluded from deciding this case on constitutional grounds upon summary judgment, where defendant may prevail at trial on the merits.

ii.      Factual Premises

Second, in advancing his constitutional argument in support of summary judgment, defendant presents facts in the light most favorable to him, rather than drawing all inferences in favor of plaintiff.

For example, defendant argues that the North Carolina Court of Appeals recognized the potential for an as-applied challenge to the instant case where the "marriage at issue was 'with an

abusive spouse," and he suggests that plaintiff's marriage with defendant should be so characterized. (Def's Mem. (DE 67) at 21 (quoting <u>Malecek</u>, 804 S.E.2d at 598)). As an initial matter, <u>Malacek</u> does not specify the standard so broadly without qualification. Rather, <u>Malecek</u> states:

> We emphasize that our holding today does not mean that every application of these common law torts is constitutional. There may be situations where an as-applied challenge to these laws could succeed. <u>Take, for example, one who counsels a close friend to abandon a marriage with an abusive spouse</u>. But this case, as the parties concede, is not one of those cases.

<u>Malecek</u>, 804 S.E.2d at 598-99 (emphasis added). In this respect, <u>Malecek</u> speculates in dicta about a potential scenario involving, first, "one who counsels a close friend," and, second, an "abusive spouse." <u>Id.</u>

Putting aside at this juncture the validity of the constitutional standard suggested by <u>Malacek</u>, defendant's factual characterization is not supported by the facts viewed in the light most favorable to plaintiff. Drawing inferences in plaintiff's favor, defendant was not interacting with Ms. Allegood for purposes of "counsel[ing] a close friend to abandon a marriage with an abusive spouse." <u>Id.</u> Rather, it is reasonable to infer from all the circumstances that he interacted with her in private in Anaheim, and he had sexual intercourse with her in the hotel room in Wilmington, because he wanted to get to know her, and he wanted to have an intimate, romantic, and sexual relationship with her. (<u>See, e.g.,</u> Ms. Allegood Dep. (DE 75-3) p. 116 ("[I]t was surprising to us too, how compatible we were and – . . . we didn't know each other."); <u>Id.</u> (DE 80-7) p. 111 ("We didn't know each other. We were getting to know each other."); Def's Dep. (DE 80-6) (recognizing "it would have been a little awkward" to have talked with Ms. Allegood in his hotel room while his wife was in the room).

Likewise, many of the facts that defendant uses to characterize plaintiff as "abusive" are refuted by plaintiff or susceptible to contrary inferences drawn in favor of plaintiff, in light of all the circumstances. For example, defendant asserts that Ms. Allegood "didn't agree with [plaintiff's] gambling," (Def's Stmt. (DE 68) ¶ 7), and plaintiff sustained substantial gambling losses while he was earning no money. (Def's Reply (DE 85) p. 2). But Ms. Allegood and her family accompanied plaintiff on numerous gambling trips, sat with him while he gambled, celebrated their anniversary with him at a casino, and encouraged his gambling. (Pl's Decl. (DE 80-5) ¶ 5-8; Pl's Dep. (DE 80-8) pp. 3, 25; Pl's Stmt. (DE 78) ¶ 7; Mirakaj Decl. (DE 80-1) ¶ 14; Ms. Allegood Dep. (DE 80-7) p. 78). Plaintiff also partially paid for those losses by selling a Steinway piano, which he had purchased in 1998, and a Yukon SUV, which he had purchased in 2009, in addition to withdrawing funds from Ms. Allegood's retirement account. (Pl's Stmt. (DE 78) ¶¶ 84, 86).

Defendant points to a text message exchange in 2015, where plaintiff used harsh and negative language, stating for example, "[You] make problems out of nothing and then try and convince me I'm to blame and that sh** has to stop"; "I'm f***ing done being your punching bag"; "Tired of your discontent and unhappiness. I encourage you to go find what you want . . . that will make you happy." (Def's App'x pp. 259-260 (DE 75-6); Def's Reply (DE 85) p. 2). Plaintiff, however, advances a different perspective on these text messages based upon their timing and Ms. Allegood's responses thereto. (Pl's Stmt. (DE 78) ¶¶ 21, 98; Pl's Dep. (DE 80-8) pp. 64-65). Plaintiff likewise has presented substantial evidence of other loving messages and interactions between Ms. Allegood and plaintiff in the record. (Pl's Stmt. (DE 78) ¶¶ 90-100; Pl's Decl. (DE 80-5) ¶ 10; Pl's Dep. (DE 80-8) pp. 36, 43, 170, 174, 195; Pl's App'x pp. 132-136 (DE 80-9) and pp. 194-195 (DE 80-12) (text mesages); Mirakaj Decl. ¶¶ 8, 12-13; Claud Allegood Decl. (DE 80-2) ¶¶

8; Melody Allegood Decl. (DE 80-3) ¶¶ 4-5, 10; Elizabeth Hinton Decl. (DE 80-4) ¶¶ 5-8; Ms. Allegood Dep. (DE 80-7) p. 60, 146)).

Defendant also points to an incident on an August 2016 family trip to Bald Head Island, where plaintiff allegedly laughed off an incident in which Ms. Allegood had thought plaintiff had drowned, which defendant characterizes as the "'straw that broke the camel's back' of the Allegoods' marriage." (Def's Mem. (DE 67) p. 9). Again, however, plaintiff presents evidence setting forth his perspective of the incident, as well as multiple family trips and interactions following the incident and around that time. (Pl's Stmt. (DE 78) ¶ 73; Pl's Decl. (DE 80-5) ¶¶ 7-8; Pl's Dep. (DE 80-8) pp. 151-157; Pl's App'x pp. 141-143 (DE 80-9) (cards), pp. 190-191 (DE 80-11) (photos), 193 (DE 80-12) (plans for Anaheim trip); Mirakaj Decl. (DE 80-1) ¶¶ 7, 15, 16).

In sum, given multiple nuanced and disputed facts about the characteristics of the marriage between plaintiff and Ms. Allegood, this case, at this juncture, does not provide an adequate basis for holding application of the instant torts unconstitutional. Therefore, defendant's motion for summary judgment must be denied.

2. Plaintiff's Motion

Plaintiff seeks summary judgment in his favor on his criminal conversation claim, where he asserts there is no dispute of fact as to each of the elements of the claim. In particular, apart from the elements of sexual intercourse during the marriage, which are undisputed, plaintiff contends there is no genuine issue of fact that Ms. Allegood's "physical separation" from plaintiff for purposes of North Carolina General Statute § 52-13(a) took place after the date of sexual intercourse with defendant on February 18, 2019.

As pertinent to the instant motion, North Carolina General Statute § 52-13(a) provides that "[n]o act of the defendant shall give rise to a cause of action for . . . criminal conversation that occurs after the plaintiff and the plaintiff's spouse <u>physically separate</u> with the intent of either the plaintiff or plaintiff's spouse that <u>the physical separation remain permanent</u>."  N.C. Gen. Stat. § 52-13(a) (emphasis added).

Under North Carolina law in existence prior to the enactment of § 52-13(a), "[t]he word 'separation,' as applied to the legal status of a husband and wife, means [a] cessation of cohabitation of husband and wife."  <u>Dudley v. Dudley</u>, 225 N.C. 83, 85 (1945) (quotations omitted).  "Cohabit," in turn, "means: To live together as man and wife; usually, though not necessarily, implying sexual intercourse."  <u>Id.</u>  (quotations omitted).  "Cohabitation includes other marital duties . . . besides marital intercourse."  <u>Id.</u> at 86. At the same time, however, the law "does not contemplate, as essential to an effectual separation, . . . a repudiation of all marital obligations."  <u>Byers v. Byers</u>, 222 N.C. 298, 304 (1942).

Accordingly, "[s]eparation . . . implies living apart for the entire period <u>in such manner that those who come in contact with them may see</u> that the husband and wife are not living together."  <u>Matter of Adamee's Estate</u>, 291 N.C. 386, 391 (1976) (emphasis added).  Separation is precluded "when the association between them has been <u>of such character as to induce others who observe them</u> to regard them as living together in the ordinary acceptation of that descriptive phrase."  <u>Id.</u> (emphasis added).

In this manner, whether a husband and wife have physically separated is "an objective test."  <u>Higgins v. Higgins</u>, 321 N.C. 482, 486 (1988).  "Competent evidence of the dealings of the parties with each other during this period may be considered by the jury upon this question."  <u>Byers</u>, 222

N.C. at 304; <u>see, e.g.,</u> <u>Mason v. Mason</u>, 226 N.C. 740, 742 (1946) ("Controverted issues of fact as to separation and cessation of cohabitation between the husband and wife were decided by the jury.").

Defendant presents sufficient evidence to create a genuine issue of fact regarding whether physical separation preceded defendant's sexual intercourse with Ms. Allegood on February 18, 2017. In her supplemental declaration, Ms. Allegood asserts: "When I left the marital residence the morning of February 16, 2017, I did so intending to physically separate from Plaintiff and intending for that separation to be permanent." (Ms. Allegood Supp. Decl. (DE 82-2) ¶ 3). She states, further: "I packed a suitcase of my clothes, toiletries, personal items, and work materials from my home office and drove to Wilmington," where she remained for over five days. (<u>Id.</u>). With respect to the night of February 21, 2017, plaintiff states: "Having nowhere else to stay that night, I headed back to the marital residence – but only after <u>requesting Plaintiff to vacate the marital residence and stay with his mother. It was my expectation that he would not be there when I arrived that evening</u>." (<u>Id.</u> ¶ 5) (emphasis added). Ms. Allegood further declares as follows:

> When I arrived at the marital residence the evening of February 21, I learned that Plaintiff had not vacated the home as I had requested. <u>I immediately asked him to please leave and to stay with his mother;</u> he refused. In an effort to keep things calm, and <u>to avoid a face to face confrontation with Plaintiff as I feared Plaintiff when we argued and he became angry, I retreated to the guest bedroom,</u> and Plaintiff went upstairs. I was very tired by that point and just wanted to be left alone and go to sleep. <u>I stayed separate and apart from Plaintiff the remainder of the evening and slept by myself in the guest bedroom downstairs.</u> I left the marital residence at approximately 7:30 a.m. the next morning, with my suitcase packed, and headed to work and an overnight work-related trip to Virginia. I do not recall having any contact with Plaintiff that morning.

(<u>Id.</u> ¶ 6) (emphasis added).

Drawing all inferences in the light most favorable to defendant, Ms. Allegood's return to the marital home on the night of February 21, 2017, did not mark an end to the physical separation commenced on February 16, 2017. Rather, Ms. Allegood returned to the home that night only out of practical necessity; she requested but was unable to insist upon plaintiff vacating the residence; and she stayed only as long as necessary "separate and apart from Plaintiff" in a different floor of the residence. (Id.). Thus, it may be reasonable to infer, in light of all the circumstances, that Ms. Allegood and plaintiff were acting on February 21, 2017, "in such manner that those who come in contact with them may see that the husband and wife are not living together." Adamee's Estate, 291 N.C. at 391. In other words, the facts do not require a conclusion as a matter of law that they were acting "of such character as to induce others who observe them to regard them as living together in the ordinary acceptation of that descriptive phrase." Id.

Plaintiff argues that a series of text messages between plaintiff and Ms. Allegood between February 9 and February 19 show that they did not begin living apart until February 22, 2017. (Pl's Reply (DE 83) at 2-3). The text messages referenced, however, bear upon Ms. Allegood's intent to physically separate. (See Pl's Supp. App'x (DE 84-1)). Viewing inferences in the light most favorable to plaintiff, they do not require a conclusion contrary to her present declaration that she intended to permanently physically separate from plaintiff starting February 16, 2017. (See Ms. Allegood Supp. Decl. (DE 82-2) ¶ 3).

Plaintiff also suggests that February 21, 2017, as a matter of law, was the last date before physical separation, because that was "their last overnight together in the marital home." (Reply (DE 83) at 5). In making this suggestion, however, plaintiff assumes facts in the light most favorable to him, and fails to mention facts favoring defendant's theory of physical separation. In

particular, plaintiff characterizes their last overnight as "together in the marital home," but from Ms. Allegood's perspective they were not "together," but rather "separate and apart," because she stayed in a guest room and had already requested that he vacate the residence. (Supp. Decl. (DE 82-2) ¶ 6). Viewed in the light most favorable to defendant, it is reasonable to infer that Ms. Allegood's return to stay in the guest room was not a return to cohabitation.

In sum, because genuine issues of fact preclude judgment as a matter of law on plaintiff's criminal conversation claim, plaintiff's motion is denied.

## CONCLUSION

Based on the foregoing, the instant motions for summary judgment (DE 66, 70) are DENIED. Where claims remain for trial, the case now is ripe for entry of an order governing deadlines and procedures for final pretrial conference and trial. The parties are DIRECTED to confer and file within **21 days** from the date of this order a joint status report informing of 1) estimated trial length; 2) particular pretrial issues which may require court intervention in advance of trial, if any; and 3) at least three suggested alternative trial dates. In addition, although mediation previously was undertaken in this case, the parties shall specify if they wish to schedule additional alternative dispute resolution procedures in advance of trial.

SO ORDERED, this the 20th day of May, 2019.

_____
LOUISE W. FLANAGAN
United States District Judge